Case number 211226 Saginaw Chippewa Indian Tribe of Michigan et al. v. Blue Cross Blue Shield of Michigan Oral argument not to exceed 15 minutes per side. Mr. Reinders, you may proceed for the appellant. May it please the court, good morning. My name is Perrin Reinders. I represent the Saginaw Chippewa Indian Tribe and I have reserved three minutes for rebuttal. This appeal addresses an Indian tribe's right to pay no more than Medicare-like rates, or MLR, for hospital claims involving tribal members. That, in fact, was the issue before this court three years ago or so when it decided the first time we were here in this case in 2018. At that time, the court noted that my client based its claims on 42 CFR 136.30 and it described that regulation as requiring two things. That Medicare participating hospitals accept payment for services at a rate that is no more than what those services would cost under Medicare. That's the first point. Two, provided that the services are authorized by a tribe that is carrying out a contract health service program. At that time, Blue Cross argued really what it is arguing today, that there is an additional requirement under the regulation. The court noted, this court, at that time, these regulations, Blue Cross, Blue Shield of Michigan contends, apply only to the expenditure of IHS funds. There was an additional requirement that you show what money was being spent, not just that it was authorized by a tribe. This court went through our complaint, noted all of our allegations, and said that since the tribe has alleged that Blue Cross, Blue Shield of Michigan was aware of the MLR regulations, that Blue Cross, Blue Shield of Michigan failed to ensure that the tribe paid no more than MLR for MLR eligible services, and that all other conditions preceding to the claim were met, the tribe has sufficiently pleaded that the MLR regulations are applicable to Blue Cross' administration of the tribe's ERISA plan. So we had alleged all of the requirements. Our job was to go back and do discovery to determine whether or not I could prove all of the allegations in the complaint. Blue Cross had argued earlier that there were additional requirements not pledged, and this court rejected the idea that those additional requirements existed. Nevertheless, on remand, the trial court framed the issue as requiring more than what this court said, more than what the plain language of the regulation requires. Trial court indicated that issue in this case is whether medical service is eligible for Medicare-like rates when an employee health care plan engaged by the tribe uses a source of funding other than CHS funds to pay for the service. The trial court presumed at that time that my client, the tribe, used a source of funding other than CHS funds, and determined that that requirement existed in the regulation, and he held the MLR is only applicable for those services funded by CHS. That's simply not what the regulation requires. The regulation requires that the payment is authorized, or rather the service is authorized by a tribe or tribal organization carrying out a CHS program. You have to prove that the service is done at a Medicare-participating hospital, and you have to prove that the service was authorized by the tribe. Where do we get to the actions of the frequently asked questions or the other documentary evidence? It seems like if we just look at the plain language, you're saying that it is an entity that carries a plan and not necessarily that the payments have to come through that. But then we've got the response that, well, here is all the information that's come out pursuant to this regulation and rule, and it speaks differently. How do you thread the needle to show that you are correct on the plain language and that the entity itself was in some ways misinterpreting that language? Well, first of all, I don't think the entity was interpreting the language. I don't think that the IHS, the Indian Health Services, was interpreting that language. They linked to their website FAQs that were prepared by another entity from California. In addition, there are four or five other FAQs that we cited in our brief. They're inconsistent with your position, though. I would say that the other FAQs which we've cited are perfectly consistent with our position. Well, I'm looking at 10, 11, and 29, which are the two that are even known by number. I don't know. I apologize, Your Honor. It would be in our brief where we went through and we pointed out the other FAQs. One of them said, we use third-party funds to pay costs for certain members who do not qualify for CHS funding. Do Medicare-like rates apply for these services? Answer, no. That seems to be inconsistent with your position, right? I know you're saying they aren't binding and they're written by someone else. I'm just asking whether they're inconsistent with your position. That's inconsistent with your position, right? I would say not. Let me jump ahead, unless I'm misunderstanding the question. It's a pretty simple question. Well, let's back up. Allow me to back up, Your Honor, just for a moment to kind of lay the environment here. IHS provides health care services to American Indians, but it doesn't have that many facilities. It can't do the job by itself. And so the CHS program, also called Purchased Referred Care, CHS or PRC, was created. And that authorized Indian tribes could set up their own CHS programs to, in effect, do what IHS was doing in part for the American Indians. Saginaw Chippewa Indian Tribe is authorized in that way and does have a CHS program and does carry out Purchased Referred Care. Now, it does really two things, my client does. First, it has a clinic on tribal lands that helps local members of the tribe who need routine medical care. But a lot of what people need can't be done at the clinic. And that's where you have Purchased Referred Care. So the tribe purchases care, refers people to third-party providers, to other hospitals. Who might be subject then to Medicare and a lower cost, right? If those hospitals are basically all Medicare-participating hospitals, but they would need to be for purposes of this regulation. So we're only considering claims that would be at such hospitals. That money that's used to pay for those claims is tribal money. It came from either IHS or it came from the tribe's own operations and is commingled and protected in one or more trust funds over time that's changed. So these are tribal dollars supplemented with federal dollars used to pay for the services that are referred out that the clinic can't handle. So this wasn't a third-party payment. It was a payment that was being made by the tribe. It is a CHS program. Absolutely, it's a CHS program. And I took the district court's opinion to be that if it's going out through the CHS program, then the Medicare limits apply, but otherwise not. Correct. You're trying to expand it to beyond that. The irony of this case, Your Honor, is that all of the payments that were made to hospitals for which we are seeking MLR pricing came from the CHS program. They are tribal dollars put into work for the CHS program. All CHS programs were funded by IHS. In part. Only in part. Would it make sense that that part would be the part that got to do that? That seems to be the plain meaning of this regulation. I think that what's going on there is there are tribal members whose only health care comes through this program. There are tribal members who have a job somewhere that provides health care to them. And so they would have their own health care system. There's two programs here, one's with your tribe, one's for employees and one's for members. Is that right? Yes, we have two plans. Your argument here would apply to both of those, is that correct? Correct. One of those gets no CHS money. Correct. So it's a little strange to say that a regulation which deals with CHS programs would be broad enough to cover this whole program dealing with employees that don't get CHS money. That seems to be the thrust of what the district court held below. Am I right? In part. The judge did not seem to understand how the system worked. But he did read these regulations pretty carefully. I'm understanding your argument, help me if I'm wrong, to be that your position is supported by the literal language of 136.30B. Correct. And I read this over and over and it's hard for me to get to where you are from this language. It says the payment methodology under this section applies to care furnished, and then there's a parenthesis which includes a lot of, by which we mean biomedical participating hospital, which is then defined in three lines. And then you come down to that it's authorized, one, by the IHS in effect, and two, by a tribe or a tribal organization carrying out a CHS program of the IHS under this statute. So two is a CHS program of the IHS. So that's normal reading would be it's authorized, it's money authorized under this thing, which is aimed at people who benefit from the IHS. But now we're taking that language and saying, or you are, your position is, that that language, by its terms, regardless of the fact that the FACs and the letters seem to be inconsistent with that, by its terms applies to people who are beyond that. For instance, this whole program dealing with employees who are not CHS. Are you with me? I don't see how you get there because it says authorized by a tribe carrying out a CHS program of the IHS under this statute. Where does that expand to people like the people in the employee part of this program? That's my question. Okay. So there are two plans. The one plan is the member plan. Everybody in that plan is a tribal member. Okay. That seems not to be a problem. In fact, Blue Cross didn't even address that plan in their briefing. The plan that Your Honor is talking about is the employee plan. And a good number of the people in that plan, though, right? Pardon me? That's a big plan, though, right? That's a big difference. It is. You're saying that's covered. There are members in that plan who, there are tribal members who work for the tribe and happen to be in the employee plan. They are tribal members. And when that, if they have a copay or deductible that they have to pay by virtue of the plan design, they can go to the CHS program and get those copays or deductibles paid. That would be the extent to which they participate in the CHS program. What about people in that plan, employees who are not members? That's not part of this case. We're not seeking MLR for any of those people. It has nothing to do with this case. There's been so much attention to that because we're not claiming it. That's really not at issue. If you're a tribal member and you are entitled to CHS benefits under the CHS program, which this tribe has authority to operate, and it's authorized, they only authorize claims that are consistent with the CHS program for tribal members who are entitled to benefits under the CHS program. So if one of those tribal members goes to a Medicare participating hospital and is pre-approved, pre-authorized, and that's the entirety of our case. All this case is about is those people and those claims. You are entitled to MLR payment methodology because you are at a Medicare participating hospital and you are authorized by the CHS program. I know my light's on. I think I've answered the question. I appreciate the Court's time. Thank you. Your Honors, may it please the Court, Casey Flint on behalf of Blue Cross Blue Shield of Michigan. I want to clarify a few things from the colloquy between Your Honor and my friend on the other side. To start, Your Honor, I completely agree with the thought that subsection B of the regulation clearly indicates that this regulation applies to CHS program claims. Only. That's correct. Only CHS program claims. But authorization is not the end of this regulation. That's what subsection B addresses. But then it says if there's a claim authorized by a CHS program, then the payment methodology in this regulation applies. So then you have to read on in the regulation to find out what that payment methodology is. And on the regulation's plain text, subsection- You're taking this out of B now? That's right. I'm moving on. I was going to say the whole thing is B. B tells you that the entire section- Are they right about their interpretation of B? I'm sorry? Yes, that's right. I think the tribe's interpretation is that- The tribe's interpretation of B is correct. No, that is- What's wrong with B then before you go on to the others? So B tells you that this regulation applies. The payment methodology in this regulation applies. But it does not tell you what the payment methodology is. Now, subsection C and D- So when they talk about the plain language of the statute undermines the district court's opinion, they're just referring to the first three words and that's all? They think that application is all that matters. But the regulation then tells you how the payment methodology applies. And subsections E, F, and G are very explicit that the Medicare-like rate provisions of this regulation only apply to payments by an ITU. And that returns back to subsection B that you were asking about earlier, Your Honor. Payments by a tribe carrying out a CHS program. So that is how you get the whole package. Okay. You know, at the end of Mr. Rinder's argument I sort of had a eureka moment and now you have sort of vanquished that. Mr. Rinder said that the concern was- The plan covering tribal members, you all I think are in agreement about the MLR for that. And with respect to- I disagree, but I'll listen to Mr. Rinder. All right. But then on the other one, the one for the employees, they were seeking to have the MLR rate apply only to those employees who were tribal members. So if you had non-tribal members in there, they weren't seeking to get the MLR rate for that. And I thought your argument was that the regulations exist to support the healthcare system comprised of the IHS and the programs operated by the tribes. And wouldn't both of those be operated by the tribes? The regulation exists to support CHS programs. And as Judge Rogers- Not the IHS. The IHS and CHS are together. So there's a federal scheme for contract health services programs. It's a creature of federal law. IHS provides funds. In this case, it's a CHS program operated by a tribe. IHS isn't operating the program, but it is providing funding. The tribe also provides some of its own funds. There are some requirements that go along with the CHS program. If you're a tribe, you're going to operate a CHS program. You have to comply with federal eligibility requirements, all that stuff. But you do get benefits. You get IHS funding, and you get benefits of the MLR pricing regulation. So that's for CHS programs. That's over here on this side. Now, the tribe operates its employee plan and its member plan. And these are completely outside of the federal contract health services scheme. They do not- No federal dollars go into the- No federal dollars. They are not subject to and they do not impose the federal eligibility requirements that a CHS program has to apply. They don't operate under the governing requirements of the contract health services program at all. So they don't have the constraints of a contract health services program under federal law. They also don't have the benefits. They don't get IHS funding. They don't get the benefit of the MLR program, which is directed- So if it's a tribal member who is an employee, they wouldn't have the option of going under the ones that get the federal plans. They would have to be under the employee plan, even though they're also a tribal member. The way the tribe used the two plans was to treat them completely separately. So if you're a tribal member and you're covered by the employee plan, and so let's say you want to access contract health services, the first thing you have to do is go to a tribal facility. For the Saginaw Chippewa Tribe, it's the Nimkee Clinic. You need to go there, and they need to say, okay, we can't treat you here, so we're going to give you a referral or a purchase order to obtain care elsewhere. Then you have to take that purchase order, and you have to bring it to the provider. You have to do all those things if you're going to get care under a contract health services program. Now let's say you do all that, and then you get your care. The provider, the first thing they do is bill your insurance. Now you're covered under the employee plan, so the first thing they'll do is bill your employee plan. The MLR regulation doesn't limit how the employee plan pays. It only limits how the contract health services program pays. Now the tribe has argued that it doesn't actually matter. The regulation applies the same to all of these because they all have some tribal funding. Say all of these. I mean the employee plan and the member plan on this side, and the contract health services program on this side. But when you say in the employee plan, you're just talking about the employee plan when the employee is a member. That's right. They say otherwise, it's not what this case is about. So they are only claiming reimbursement for claims that they say were authorized through the contract health services program. Now some tribal members could be eligible for contract health services programs, but they're covered under the employee plan. The question is whether payments made by the employee plan are subject to an MLR cap. And they're not because the MLR regulation in subsections E, F, and G says very clearly that the only payments that are subject to an MLR cap are payments from the CHS program. Here's the problem for me is that it seems like the division that you're making doesn't look to the right actor. If we're looking at 13630, it says tribe or tribal organization carrying out a CHS program of the IHS, rather than a tribal CHS program, which is the term you use in your briefing, which I think is different from the language of this regulation. And it seems to me that the language of the regulation indicates that the actor, the relevant actor under this regulation is the tribe and not the CHS program itself. With respect, Your Honor, it's the tribe, as you said, carrying out a CHS program. It is not a tribe that also has a CHS program. It is a tribe in the act of carrying out a CHS program that gets the benefit of this regulation. And that's in 13630? Yeah, B, subsection B. I thought that was the crux of this case, but you're saying it's not, and so I'm in some confusion now. So if you read that as saying what Judge Stranch contends is one possible reading, it's that if you are a tribal organization that carries out a CHS program, then anything that tribe does gets the benefit of the limitation. But you're clearly saying that's wrong, but I interpreted your opponent as saying that's wrong as well. So then I got confused as to what exactly they are saying that you're concerned about. There are two steps. There's authorization and there's payment. So the first question before you even figure out whether we even need to talk about Section 136.30 is has it been authorized by a CHS program? Now, the tribe has said we're only pursuing claims that have been authorized by a CHS program. So they say we're limiting our case to that. We won't ask for anything other than that. But then the second question is, okay, if it's been authorized, now we need to read Section 136.30, and we need to figure out how the payment methodology applies. And that's how you get to subsections E, F, and G, which say only an ITU pays under the MLR methodology. My problem with that is your argument under ITU is entirely circular because you use the term that the ITU, throughout the regulatory language, supports. You argue that CHS funding is necessary because of the references to ITU. And that seems circular to me, and let me make sure I'm saying this correctly, because the regulatory definition is a contract health services program of the Indian Health Service, a tribe or tribal organization. We're back to the very same thing. Carrying out a CHS program of the IHS under, of course, the Indian Self-Determination Act. So it just seems like your argument brings us circularly right back to the same issue of what does it mean when it says a tribe or tribal organization carrying out a CHS program. And that to me then says, and who is the actor to whom you look? And the actor in these regulations seems to me to be the tribe. Well, I would submit that the actor is the tribe carrying out a CHS program. I would further submit that is what the IHS... Well, it doesn't say carrying out this CHS program. It says carrying out a CHS program of the IHS. And I think part of it, the structure that seems important to me, is that this flows out of Indian self-determination. And so the purpose of this is to enable the tribes themselves to have some self-determinative role in how this works. And if that's the goal, then if they have one of these programs, then why isn't that sufficient to say it is the whole ball of self-determination that this regulatory environment addresses? And that means that we are trying to save the Indian money as the payment of last resort. And so you must get for them the MLR rate when it is authorized at a facility that offers it. In the process of answering that question, just a minute, Judge Rogers. In the process of answering that question, I want you to go back and focus on this distinction that you made before with the carrying out versus also carrying out. And I think you made that in response to Judge Rogers' question. So in answering Judge Stranch's, would you go back and clarify the emphasis there? Thank you. And the only gloss I want to say is I took what Judge Stranch said to be the argument of the other side. But I took the other side to be not arguing that before us today. So when you get up, you need to clarify whether that's your argument or what you said earlier is your argument for me. All right? Thank you. Go ahead. I'll move in part. Thank you. So the regulation provides that who gets the benefit of MLR payments? A tribe carrying out a CHS program. And to answer your question, Judge Donald, that means a tribe in the process of carrying out a CHS program. When does the tribe get the MLR pricing benefit? When it is carrying out a CHS program, when it is paying for claims under a CHS program. That is what the IHS frequently asked questions say. Some of them. But some of them say something different, don't they? Once you concede. I will not concede that anything disagrees with that. Some of them don't address this specific question, but the ones that do address it say that payment has to come through a CHS program to be capped at MLR. And they say if payment comes through something that is not a CHS program, it is not capped at MLR, including something that comes from a tribe if it is not from the tribe's CHS program. That is how IHS interprets it. Okay. Let me just ask you one other question. How does the NDN canon fit into this? If what we are doing is looking at the regulatory language at 136.30, don't you have to follow the normative rules of construction in looking at that language to determine whether it is ambiguous? And doesn't the NDN canon have a significant role in that interpretation? I would like to answer that question, and then I would like to make one more point, though I recognize that my time is up. Please. So to answer that question, the NDN canon of construction, even when it applies, makes clear that the court may carefully consider the interpretations of the IHS. That is from the case law in the amici brief. Cobell, the D.C. Circuit case, says that expressly. Even if it applies, the court can carefully consider IHS guidance. They know what they are talking about, after all. It does not get Chevron deference, but it can be considered. But I would submit that the Indian canon of construction doesn't apply here. That canon comes out of the trust relationship between the United States and tribes. This regulation, the entity that it imposes obligations on, it doesn't deal with the sort of fighting back and forth about sovereignty and power between tribes and the United States that the Indian canon deals with. This regulation says hospitals have to accept reduced payments if they are going to accept payments from a CHS. I have a case which supports that distinction, because I was thinking about that in chambers and trying to find support one way or the other. It seems like sometimes it is stated in terms that just applies. If you are an Indian tribe, you get an advantage. Logically, you would think it would be something tied into government protecting Indians as opposed to business decisions between Indian tribes and other entities in the economy. The Cobell case says that. Cobell in the D.C. Circuit, which is cited in the amicus brief. One of the self-determination cases. I'm sorry, I'm forgetting the name. It's cited in our brief. It says the same thing. These principles are about the back and forth between the United States and Indian tribes. Here's the problem for me. ERISA is a fiduciary statute. It is based on trust law. We have this relationship between the federal government and the Indian tribes that is supposed to honor some self-determination and the sovereignty of two nations. It is a trust issue. Then you get down to how the money is used that the tribe creates and that the federal government gives. Once again, you're in a fiduciary issue. Who is using whose money? That's the nature of ERISA law. There's a wonderful article about it when it first came out that says, what is ERISA? It's talking about other people's money. We're back right in that very same situation. We are looking at the fiduciary obligations relative to other people's money. The Indian tribe's money and the federal government's money. I don't see how talking about sovereignty cuts off the fiduciary obligations that grow from sovereignty and the use of funds of sovereign entities. The sovereignty principles that support the Indian canon of construction, they don't apply when the federal government is imposing obligations on Medicare participating hospitals. Why not? The federal government, with this regulation, is saying to Medicare participating hospitals, you hospitals, when you accept our money under the federal government's money, you have to give us Medicare rates. Same story when you accept our money through other federal or federally funded programs, such as CHS programs. That is why the money has to come through the CHS program rather than a totally separate tribal program like the employee plan and the member plan. How do you account for the Indian Self-Determination Act in which it tries to give both self-determination and in order to do that says your money will be the money of last resort? The Indian self-determination principles allow the tribe to design its CHS program as it sees fit. There are certain requirements, as I was discussing with Judge Donald earlier, that the tribe has to comply with for its CHS program. But otherwise, the tribe can design the program. It can add funds to the program as it sees fit. The employee plan and the member plan are totally outside this scheme. So that phrase that the tribe's money will be the money of last resort is just surplusage in your mind? Respectfully, I should have clarified, the last resort language refers to IHS money. I think we're referring to Section 42 CFR 136.61, which says IHS payments will be payments of last resort. And the CHS program is also the payer of last resort. The CHS program, which is the shepherd of IHS funds in this context. But really, the point that I ask the Court's indulgence to allow me to make is this has been an excellent discussion of how this regulation works. But at the end of the day, what we are asking about is whether Blue Cross is in breach of some fiduciary duty for processing claims for the employee plan and the member plan. Now, Blue Cross, when it was engaged by the tribe to process claims for those plans, they signed a contract. And the contract said Blue Cross will process claims according to its standard operating procedures. It said Blue Cross shall process claims according to its standard operating procedures. It did not say Blue Cross will obtain MLR pricing under the regulation. And that would have been quite a different undertaking for Blue Cross because... Let me make sure. This is what the district court below did not reach. That's right. It did not reach the question. If we decided there was an issue as to that, is that an issue that you would expect us to address or you would expect to go back for the district court to address in the first instance? This court can certainly affirm on any basis supported in the record. And this is amply supported on the current regulation. I'm struggling with that because a contract question depends upon a meeting of the minds, which depends upon fact, and we've got allegations of fraudulent concealment. I know those are the statute of limitations, but aren't all of those things that must be considered factually in order to determine what the exact relationship was between Blue Cross Blue Shield and the tribes? The factual record on this is extremely clear. It is not just the contract language, although that is clear. The tribe repeatedly asked Blue Cross Blue Shield, the tribe itself and through its insurance agents, we want MLR pricing. We know that you are not giving us MLR pricing. Will you please start giving us MLR pricing? So there's no deception. There's no concealment. Everyone knew that Blue Cross wasn't doing... So the trial court did not make findings on that? The trial court granted summary judgment on its correct... On that particular issue. It did not address the scope of an arrest of duty. So the district court... I apologize. I lost my train of thought. So yes, the factual record is extremely clear that everyone understood that Blue Cross was not obtaining MLR pricing. No confusion, concealment, nothing like that on that topic. And when Blue Cross was asked, will you please change the contract? Will you please start giving us MLR pricing? They said, no, that's not part of our model. Contradictory evidence where internally in Blue Cross Blue Shield, there were some statements about if this is the contract we owe. Your position is there's nothing of evidence from Blue Cross Blue Shield that suggests that you may have owed a duty to look at MLR or to obtain MLR financing for these claims. That is correct. There's internal discussion of these tribes would like MLR pricing. Should we try to figure it out? Can we do it? Should we do it? Are other people doing it? Can we possibly contract with a third-party administrator to do it? Because it's way beyond our capacity. Lots of discussions like that. And at the end of the day, the conclusion was, no, we can't do it. And that is what they told the tribes. So the contract that existed, the contract that governs the entire relationship, said standard operating procedures. And if they had started doing MLR pricing, the tribe's theory is that notwithstanding what the contract said, ERISA somehow independently required the Blue Cross to undertake MLR pricing notwithstanding the contract. But that would have been a huge departure from what the contract required because Blue Cross would have had to determine whether an individual plan participant was even eligible for contract health services, as we've discussed, in the employee plan. Most of them were not. I think we may be beyond the issues that are right before us now, but we appreciate your help. Can I ask just one final question? Please. You say that everything Judge Ludington held is correct. Yes. Is that right? Right. So if we wanted to reverse, we'd have to find something wrong in there, right? You would have to find something wrong. What they claim is wrong is, as I understood it, was an interpretation of sub B here. And we can debate that, and I take that to be what you all have been debating. They're also saying that there's wrongness attributable to its failure to apply other things later on, C, D, E, F, and G, or whatever they are. Am I right? I mean, were you listening? I mean, was that fair? The tribe does not address subsection C, D, E, F, or G. Who does not address it? The tribe. The tribe does not. Okay. And finally- But nor does the district court, right? The district court, I can't recall. The district court determines- That being language did not mean what the tribe says it means. Just one final point. Sure. The regulation, obviously, is complex. We've spent time exploring that. But there's one issue that is quite straightforward, and that's the statute of limitations. That is also another thing that the district court did not reach, correct? True. No findings of fact, no determinations of whether there was concealment. I know that you say the record reflects this, but the district court in the first instance has never addressed that. It hasn't, but this is a very simple, straightforward question that would support affirmance, which, of course, this court is entitled to do. The tribe knew for years that Blue Cross was not- We don't have to do it if we're uncomfortable doing it on what we have before us. To affirm on any ground before you? Certainly. And, counsel, just one other quick question. I know you said that Judge Ludington should be affirmed in every respect. So if you're positioning that there were no questions, no genuine issues of fact that were left open by the matter below, so everything was resolved based on the issues raised before the court and the evidence put forth, correct? Right. There were no material disputes of fact going to the scope of Blue Cross's duties under ERISA as to the employee plan, nor were there material disputes of fact as to the scope of Blue Cross's duties with respect to the member plan under the Michigan Healthcare False Claim Act or the breach of fiduciary duty claim. And just to be clear, because this was raised earlier, Blue Cross absolutely does not agree that the MLR regulation applies to the member plan or the employee plan, nor does Blue Cross believe that it breached any state law duty as to the member plan. And no questions about Blue Cross's standard operating procedure pursuant to this agreement? I'm sorry? I said there were no genuine issues about Blue Cross's standard operating procedures, because she said that they wanted you to do something but the contract provided you to be guided by your standard operating procedures. That's right. The contract says we would process claims using our standard operating procedure. There is no dispute about what that is. That is applying our network-wide provider discounts. So just to belabor this a little bit so I get it straight in my mind, these two plans that we were talking about, the member plan and those are Blue Cross plans, the CHS is just not included in that? It's entirely separate. Blue Cross was not retained to do anything with CHS. Your perception of what they're doing is trying to get a Medicare cap with respect to those two plans, and it just doesn't apply if you're getting coverage under those two plans. Is that your position? The Medicare cap does not apply to payments under those plans, because they're completely outside the federal- They're arguing that it does. I'm just trying to get with the nature of the dispute here. Is that your understanding of their argument? They're arguing that it applies to payments under those plans for people who they claim were eligible for contract help. Eligible under another plan, the CHS plan. That's right. Now, the contract health services scheme does allow for payment. So the contract health services program pays last. The first thing that happens is we try to get insurance from other sources, and the tribe always treated its contract health services program, always treated payments from the employee plan and the member plan as alternate resources. It said, we'll take those first. We'll take full payment from those, and only if there's anything left will our CHS program pay. The tribe just really maintains those as separate entities, and although it now claims it doesn't matter, they're all the same. It is not how the tribe constructed its plans. It's not how it operated those plans, and it certainly is not what it hired Blue Cross to do. Let me ask you something on Blue Cross. They do a number of ASC, administrative services contracts, and is your argument that the language in your standard administrative services contract never leads you to avail the people you represent of the Medicare lower rates? Of MLR pricing under this regulation? Yes. That's correct. So all of the plans that Blue Cross administers for other people do not, other entities, no, no, other anybody, you do not avail them of the reduced rates payable to Medicare under your standard administrative services contract? When we say we will process a claim according to our standard operating procedures, that refers to payment according to our provider network discounts. I frankly am not familiar with how the standard plan distinguishes between traditional, you know, standard Medicare and insured entities. I do know how this plan distinguished between contract health services eligible members. I'm kind of struggling with that answer because my experience with third-party administrators assisting entities in paying for claims is that the administrative services contracts enable a plan, maybe an ERISA plan, to itself not undertake the normative administrative services because you have expertise at Blue Cross Blue Shield and you have good discounts. But part of the service that I understood Blue Cross renders to a whole group of other clientele is, of course, to avail them of the right to get the Medicare rates. Otherwise, everybody who contracts with you is paying a much higher rate than they could pay themselves if they simply said to the service renderer, okay, hospital, I'm only going to pay your Medicare rate, which is what everybody does. I'm only going to pay your Medicare rate. Your Honor, I definitely do not want to say anything misleading here. I frankly do not know how those claims, I know that there are Medicare plans and that's just not part of this particular case, so I do not know the answer. I do know the answer as to how eligibility is determined here. If I'm understanding your question, it seems to be does Blue Cross in other plans, does it do something to determine whether someone is eligible for Medicare? In this plan, it was the tribe's obligation to determine eligibility for coverage under the employee and member plans, and the tribe has admitted that it was its obligation, we quote this in our brief, that it was its obligation to determine if anyone in the member plan or employee plan was eligible for contract health services programs. While I can't answer your other question, I can tell you how these particular parties addressed eligibility questions. I guess that's a little problematic for me because the argument up until now has been, here's our administrative services contract, we interpret it this way always. I think now your argument is that here is the administrative services contract and we interpret it this way in these types of cases where we are covering payments through the Indian member and employee funds. If we are talking about eligibility determinations, this contract between Blue Cross and the tribe answers that question and it says it is the tribe's obligation to determine that. And if the tribe finds that someone is eligible and then you are paying them on a discounted network, why wouldn't your discounted network also address Medicare rates, which is a very significant discount? Our contract with the tribe, I think this is really critical, it did not say we will calculate Medicare-like rates under Section 136.30 for you. And as I was saying before, that would have imposed a very different obligation on Blue Cross than what the contract did impose. Yeah, and maybe we're talking past each other, but my question was when you do an ASC service for normative industries, you give them your discount, your network discount rates, and do you not also do Medicare for them? I would be at a loss to understand how you would have this huge clientele out in the general company and or fund world that always ignored the Medicare discount rates because that is the hugest of network deals pale in comparison. Your Honor, I'm sure you're correct. I don't think that other plans are addressed in this record. However, I'd be happy to explore it and submit. Now then, you would just concede that your argument that administrative services contract is applied equally everywhere means only as it is applied equally across the tribal plans. That is not what I would concede. What the evidence in this record shows is that the tribe and Blue Cross agreed that Blue Cross would process claims according to its standard operating procedures, and the evidence in a declaration submitted by Blue Cross says what that meant is we will obtain... We're talking past each other. My question is what does that mean? Network discounts. Network discounts for this entity, and you cannot make a representation as to whether out in the general public it only meant network discounts. Correct. Standard operating procedures means we will give you the same network discounts that we give everyone. Now, does Blue Cross have some other means for identifying or do its clients have other means for identifying Medicare claims in different plans? I'm sorry, that's just beyond the scope of this case. Thank you. But standard operating procedures has a clear definition in this case, and most importantly, what I think really drives it home is that the contract doesn't say anything about MLR pricing, and it certainly would if Blue Cross had agreed to provide this specialized tribe-specific service, which it did not agree to do. Thank you. And ERISA doesn't impose that duty. Thank you. First of all, Judge Strange, you did articulate my position correctly, and to answer your question, Your Honor, Judge Rogers, perhaps I was trying to... That I took to be based on 136.30. 30, correct. I'm not finding that persuasive, candidly. All I can tell you... I didn't find it persuasive before. You said, well, go and look at other provisions. That's what you'd be saying. I'm concerned about that interpretation of this language. It just doesn't seem to follow to me. I'm sorry. Because when you say under, and I'm looking at B here, payment methodology applies to care furnished by a tribe carrying out a CHS program of the IHS under this statute. That's who my client is. My client is a tribe carrying out a CHS program. But you're not... It's furnished by somebody doing something, but you're not talking about they're doing that when you're talking about the limits, when you're talking about the payment methodology. Let me ask you a hypothetical question. Maybe this will explain what I'm concerned about. Somebody in my chambers came up with this example. If you have a delivery service and you pay your truckers a certain amount of money, and then all of a sudden you get a contract with Amazon and you want to pay your truckers more for the deliveries for Amazon. You agree in a contract with your truckers, with your drivers, that you will pay double for deliveries authorized by Dispatcher X. It's the only one of your dispatchers that does Amazon deliveries, for deliveries by Dispatcher X under a contract with Amazon. That would mean to me that the driver would not be able to get that double payment if it was from the same dispatcher, but it wasn't under that contract. It was under some other contract. Do you see what I'm saying? I agree completely. Here the language is just like that. It just says authorized by a tribal organization carrying out a CHS program. You're wanting to say, well, this is a tribal organization that carries out a CHS program so that when they're carrying out some other program, this applies. We're not carrying out any other program. We're carrying out the CHS program. We have tribal members. Some of them are all of the tribal members. All of the members of the tribal group are tribal members. They are Native Americans, belong to the Saginaw Chippewa Indian tribe. Some of the people in the employee group are also tribal members. Only with respect to tribal members, when they get authorized, because that's one of the requirements, authorized by a tribe operating a CHS program. Well, guess who does the authorization? The CHS program. So the people we're talking about are tribal members who went to a Medicare participating hospital after they were authorized by the CHS program. Now, council stands here and says there's the plans and then there's the CHS program. If you accept that dichotomy, there's nothing here. There's nothing in the CHS program because the CHS program is paying for the people in the member plan who are all tribal members who have gone to the program, gotten their authorization, and then the funding doesn't come from a plan. There's no money in a plan. There's money in a trust fund, and that is tribal funds in a trust fund, controlled by the CHS program for purposes of the CH program. So I think the analogy is helpful, Your Honor, but we're actually only dealing with claims where there was authorization because the person was authorized by the CHS program to get that referred care outside of the clinic because the clinic can't. So Blue Cross Blue Shield, they manage the CHS program? Well, see, that's interesting semantics. I thought they say it's different. You go to one, you don't get it, you go to the next. No, see, that's not true. The problem is that we had a ruling by a trial judge on no factual findings, not a single factual finding, one factual presumption that the payments were outside of the CHS program, which we dispute. We challenge that. He assumed that that was true and made a legal ruling, purely legal ruling based on that one incorrect factual finding. What's the incorrect factual finding in his opinion? That issue in this case is whether medical service is eligible for Medicare-like- I'm sorry. I'm sorry. I believe it was on page five of his opinion, his first opinion, before we filed a motion for- I'm talking the one that this is appealed from. Correct. Yes, from that. And he stated that issue in this case is whether medical service is eligible for Medicare-like rates when an employee health care plan engaged by the tribe uses a source of funding other than CHS funds to pay for the service. So he assumed- That sounds crucial, but I can't find it. And then he's proving- You don't have page numbers? I thought it was on page five, but it's several sections into his opinion. And I apologize- I mean, we've got all the time in the world, I guess. Page eight of his first opinion, which I believe is August of 2020. All right. Okay, go ahead. Issue in this case is whether medical service is eligible for Medicare-like rates when an employee health plan engaged by the tribe uses a source of funding other than CHS funds for the service. Correct. That's not true? That's not true, because our source of funding is not other than CHS funds. CHS takes advantage of one of these trusts that was set up by the tribe to pay for the services for their members. The CHS program exists to provide purchased referred care. If you can't go to the clinic, we're going to purchase care that you're referred to somewhere else, and we're going to purchase that care from outside of the clinic setting. And you're going to go to the hospital in Mount Pleasant or wherever. And we're going to pay for it, and we pay for it out of these trust funds that have been established by the tribe, which include federal dollars. They're not exclusively federal dollars, but they include federal dollars. And Blue Cross was hired to administer the claims. So the CHS program is run by the CHS program. They decide. They determine whether you're a tribal member, whether you're eligible. They decide what the level of care is going to be, because it depends on the resources available to the tribe. They may raise or lower the level of care that's provided to tribal members based on resources. If all Judge Ludington is doing is saying, I'm ruling with respect to money other than CHS funds, then this should not be a problem to you then. It wouldn't be, except he dismissed the case. So there I am. I mean, if he had said, as long as you can show that this money is CHS, these are tribal funds related to the CHS program or CHS funds, however you want to define it. It's semantics. I agree with you, Your Honor. And let's have a trial here, and let's find out. Were they authorized? Where did the money come from? Are those tribal funds? Were they designated to make the CHS program go? Ultimately, the Medicare-like rates should only apply if the funding comes from CHS funds? CHS funds, yes, because they consist of tribal and federal funds. They're not just IHS funds. CHS funds are tribal funds supplemented by federal funds. The tribe is operating a CHS program. They contribute their own resources toward it, and they are entitled to recover this Medicare-like rate. The statute says carrying out a CHS program of the IHS. Correct. It is a CHS program of the IHS. It doesn't say a CHS program exclusively funded by the IHS. My client's CHS program is authorized by the IHS. It exists because the IHS has said it does. So my client went through all the federal legal steps to establish a CHS program. It has it. It operates it. And the people who were treated, who received care, whose claims were administered by Blue Cross, those tribal members whose claims were administered by Blue Cross were there because they were referred by the CHS program. They were in the CHS program. The CHS program carrying out includes both federal funds and tribal funds. Correct. So the carrying out includes CHS funds? Correct. A commingled group of funds. Correct. And so we talked about the gaming. That's not the way the author of the letter that came with this and the author of the FAQs got confused about that. Is that the idea? I don't know who authored the FAQ. Whoever it was just didn't understand what you just said. I guess not. Didn't understand that in referencing CHS funds, I think the problem is we're getting caught up in the linguistics of carrying out a CHS program and treating that as if it said paying with only CHS funds. Right. And your answer is the carrying out of the CHS program is that it includes payments with commingled funds that are both federal funds and CHS funds. And educate me, if that is true, is it only true to tribe members, whether they are in the member's health care plan or the employee's health care plan? Correct. So all employees that are not tribal members go away. Go away. And that's where I might have been too cute in trying to answer Judge Rogers' question before. I wanted to make it clear we're only talking about tribal members, and the reason we know that's the case is because it has to be authorized. And the only authorization through the CHS program is for tribal members. And you have to, there are other requirements, and this court the last time talked about the other conditions precedent. One of which is not tracing that it's IHS dollars or only federal dollars or anything, really any tracing, but that there are other conditions precedent. You have to be a tribal member. You have to get the authorization ahead of time. There has to be approved in terms of the level of care that the CHS program has established at that time. Those details, if you are in fact, you won't be in the CHS program of IHS unless you also have some CHS funding. Correct. So the funding is not, is the fight over whether it's fully funded by CHS or comes from commingled monies, or is the moving target here determining what money comes through a CHS program? So all of the money that was given to Blue Cross for tribal members came from the CHS program or through the CHS program. It is tribal funds plus federal funds. And how does the record show the distinction between employees who are non-members, those claims, or were they also administering those claims for employees who are not members of the tribe? Yes. This court last time, we argued differently. We argued that this is one big plan because one plan with multiple components. This court said, no, there are two plans for purposes of the employee group and the member group. Those were separate plans. Okay, that's fine. That's the rule. So we have two plans. There are tribal members in both. The issue with MLR only applies to claims that would involve tribal members who have gone to the CHS program and gotten the authorization that's required. So that's why we know. There's a dividing line of record. Yes. You have to have had that authorization. Yes. Other questions? Please. I'm back to Part 136.30b. And I'm looking at the language, by a tribe carrying out a CHS program. And before I came in here today, I thought that could either mean by a tribe to the extent it's carrying out a CHS program, or it could mean by a tribe that as one of the things it does is carrying out a CHS program. And I thought the case kind of turned on which of those was meant by a tribe carrying out. But you seem to be agreeing that you would read it as by a tribe to the extent it is carrying out a CHS program, because the CHS program includes two cross programs. Forgive me for being a typical lawyer. But I take the broader interpretation of what that wording means, but as a practical matter. Right. But do I have to to rule? You don't. You don't. I can tell you the second one doesn't read very plausibly. All right? And it doesn't. It's much easier to read it as to the extent it is carrying out. But you're saying, fine, read it as to the extent that it's carrying out. It doesn't matter. Is that right? Right. Because the authorization, that verb, authorized by, makes it necessary that the person has gone to the CHS program to get approval in the first place. And so that means the person is a member, they're entitled to be part of the CHS program, they live within the appropriate area, that the level of care is covered.  Pardon me? MLS. Is that the idea? MLR, yes. MLR, whatever. Correct. Yes. And all of the dollars that we, that my client spent, every dollar that went to Blue Cross that Blue Cross then took custody and control of and made decisions about whether to pay and how much to pay and who to pay, those decisions that it made over dollars came from my client for the CHS program. So there's no, there's not like plans over here and CHS program over here because the CHS program had, was operating, you know, these plans were just the groups of people that were served through the CHS program. The employees would not be, the employee, the non-tribe member employees would never have been authorized through the CHS program. So it's a pretty, even though they're two separate plans, there's a mingling because all of the members came through the CHS program and a few of the employees came through the CHS program. But under any circumstance, it's documentarily clear who got the authorization and would then have qualified for the Medicare funding level. Correct. And what do you think, assuming we agree with that, the other, does that resolve the case or are there other issues regarding the statute of limitations and other factual issues that need to go back down for resolution by a district court in the first instance? Well, I was prevented from trying my case. So we understandably have to prove that in fact each claim involved a tribal member who was authorized, for example. So we did the discovery so that we can do that. We're prepared to do that and we had expected that we would prevail on summary judgment and move to trial and do that. So the case has to go back down for that reason. We've talked about a lot of facts. I've made lots of representations to this court about how things work. None of that was decided by the trial court. And so you're at a disadvantage with no actual determinations that you can evaluate. The only determination was that the assumption was that the funds at issue did not go through the CHS program. Counsel, I understand you to be saying at this hour that you believe you prevail and prevailing for you means reversing and remanding to the trial court for you to be able to try your case and win it there. Correct, Your Honor. Thank you. I very much appreciate your patience and graciousness with the time. Thank you. Well, we very much appreciate your arguments and briefing. This is a very complex issue and it will be taken under advisement and an opinion rendered in due course. All of the remaining cases on our docket for today are not argued, so you may adjourn court.